**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lewis Dixon, Jr.; Jack Dixon; Red Hawk Farming and Cooling, an Arizona general partnership, | No. CV-05-03740-PHX-NVW |
| Plaintiffs, | **ORDER** |
| vs. | |
| Mike Johanns, Secretary of the United States Department of Agriculture, | |
| Defendant. | |

Pending before the court are Defendant's Motion for Summary Judgment (Doc. # 18) and Plaintiffs' Cross-Motion for Summary Judgment (Doc. # 23).

**I.    Background**

This dispute arises from Plaintiffs' refusal to pay assessments to the National Watermelon Promotion Board ("Board") as required by the Watermelon Research and Promotion Act ("Act"), 7 U.S.C. § 4901 *et seq.*  Plaintiff Red Hawk Farming and Cooling ("Red Hawk") is an Arizona general partnership engaged in the business of producing, handling, and importing watermelons.  Plaintiffs Lewis Dixon, Jr. and Jack Dixon are partners in Red Hawk.  The following facts are undisputed.

The National Watermelon Promotion Board was created in 1989 pursuant to the Watermelon Research and Promotion Act.  Composed largely of private representatives of the watermelon industry, the Board educates retailers and consumers about the nutritional

benefits of watermelon consumption.  The Board also disseminates information to retailers about proper watermelon storage practices and safety.

Promotion Board activities are closely supervised by the United States Department of Agriculture ("USDA").  The Secretary of Agriculture appoints all of the Board's members and approves its marketing plan and budget.  The USDA also supervises Board activities, approves its research contracts and projects, and participates in its meetings.  Expenses incurred under the Board's budget are funded by assessments on private watermelon growers and importers.

Most of the Board's budget funds watermelon promotional activities, such as the publication of industry resource guides and other literature.  One such publication, a media kit, states:

> The National Watermelon Promotion Board (NWPB) operates with a single objective: to increase consumer demand for watermelon through promotion research and educational programs.  The Orlando-based non-profit organization was formed in 1989 by watermelon growers and shippers.  Since then, the NWPB has developed marketing programs to boost watermelon sales in supermarkets through the U.S. and Canada.

> Today, the NWPB represents 3,100 growers, shippers and importers of watermelon in the United States.  These members fund the organization through crop assessments.  The NWPB's 32-member Board of Directors, comprised of watermelon growers, shippers, importers, and a member who represents the public, decides how to invest its $1.6 million budget in board programs. . . .

> Nutrition is in the news forefront these days, and watermelon can play a big role as a source of nutrition.  We already know that a 2-cup serving of watermelon is high in vitamins A and C, and industry-funded research is currently investigating what else is in watermelon will help you stay healthy.  New methods of analyzing food allow scientists to discover previously unknown substances in fruits and vegetables that help the body function and repair itself.  One of the most intriguing discoveries is that watermelon contains high levels of lycopene, an antioxidant that may prevent certain types of cancer.

> Food safety is another "hot topic," and the watermelon industry shines as a pacesetter.  From the farm to your local grocery store or restaurant, industry funded research has discovered the best methods to grow, ship, store and cut watermelon.  This information is provided to growers, shippers and retailers through many avenues, such as printed guidelines for production

and handling, through educational videos and CD-ROM's for retail and foodservice, and handling information to consumers through newspaper and magazine articles.

The environment is everybody's concern, and the watermelon industry is responding to those concerns. The following projects are just some of the ways scientists are looking into environmentally sound protection methods:
> –A recycling project to find a disposal method for certain materials used during production.
> –A weather-condition disease forecasting system, "Melcast," is used to help producers know when their crop needs certain materials applied, rather than applying them according to a set schedule.
> –Extensive research to identify disease-resistant watermelon varieties, so the producer can reduce the amount of chemicals applied to the crop.

Watermelon growers and shippers realize they have to look at the long-term partnership they have with the environment, and are committed to protecting our world.

Doc. # 14, Exhibit 4.  A Promotion Board resource guide similarly states:

When the National Watermelon Promotion Board was formed in 1989, watermelon consumption was declining.  The board was charged with a single mission: to increase consumer demand of watermelon through coordinated, unified marketing, research and promotion campaigns.  Throughout the past ten years, consumption has steadily increased.

The NWPB's more than 3,100 producer, handler and importer members are committed to providing the highest quality melons during the entire year.  Their continued efforts have made the very latest developments in seed, acreage yield and post-harvest techniques standard in an industry that is more than 100 years old.

Watermelon producers, handlers and importers fund the board through a four cent per hundredweight assessment.   The National Watermelon Promotion Board is made up of producers, handlers, importers and a public member who make all key decisions regarding how the board's $1.6 million budget is invested in marketing, research and promotional programs.

Our industry has been proactively pursuing initiatives for excellence in quality and safety.  This season, we are pleased to introduce our new "Voluntary Food Safety Guidelines for the Watermelon Industry."  Drafted directly by a dedicated team of NWPB growers and shipper members, this document is more than just words, but a true commitment by our industry.  Incorporating "best practices" outlined by Western Goowers [sic], the Food & Drug Administration and other key industry groups, our own Guidelines specifically address:
> –Pre-harvest control of microbial hazards
> –Responsible use of fertilizers and pesticides

–Irrigation practices and water purification standards
–Field and employee health and sanitation
–Packinghouse/processing plant operational standards
–Critical issues in loading, refrigeration and transportation
–Comprehensive traceback systems

Remember that your NWPB Merchandising Manager has an arsenal of tools to help build customized procurement and promotional programs for your specific operations. Let that powerbase be with you as you embark on what may be the best watermelon season ever!

Doc. # 14, Exhibit 2. Plaintiffs disagree with the content of these materials for "philosophical, political and commercial" reasons. Doc. # 24 at ¶ 29. They believe that the Board's promotional assistance is unnecessary to their commercial success because they produce a type of watermelon so superior as to advertise for itself. They would not fund Board advertisements or even belong to the Board if they were not required to do so. Plaintiffs therefore refused to pay assessments for 1999 and 2000.

On July 18, 2001, Plaintiffs filed a petition before the USDA requesting an exemption from the Board's assessments. The petition challenged the constitutionality of the Act exclusively on the theory that it authorized compelled subsidies. The petition did not allege that the use of Board assessments to promote the watermelon industry constituted compelled speech.[1] R. at 1. Plaintiffs filed two subsequent amended petitions with the USDA on September 10, 2001 and January 3, 2002. The amended petitions were similar in all respects relevant for the purposes of this order.

The USDA conducted a three-day hearing on Plaintiffs' Second Amended Petition on March 12-13, 2002 and January 23, 2003. Each party submitted testimony and exhibits to a USDA administrative law judge ("ALJ") during the course of the hearing. At the time, the

---

[1] The compelled speech doctrine concerns whether an individual is singled out to fund government expression with which she disagrees and with which she is "closely linked." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 565 n.8 (2005). This doctrine is the basis for Plaintiffs' "as-applied" challenge. By contrast, the compelled subsidy doctrine concerns whether an individual is forced to fund "someone else's private speech unconnected to any legitimate government purpose." *Id.* This latter doctrine was the basis for Plaintiffs' "facial challenge" to the constitutionality of the Act.

1   case law governing Plaintiffs' First Amendment claim was *United States v. United Foods,*
2   *Inc.*, 533 U.S. 405 (2001).

3       On May 23, 2005, while Plaintiffs' Second Amended Petition was pending before the
4   ALJ, the United States Supreme Court decided *Johanns v. Livestock Marketing Association*,
5   544 U.S. 550 (2005), a case concerning the constitutionality of a federal program that
6   financed generic advertising to promote the beef industry.  Exactly three months later, the
7   ALJ denied Plaintiffs' compelled subsidy claim on the ground that the advertising authorized
8   by the Act is government speech not protected by the First Amendment. The ALJ relied on
9   *Livestock Marketing* to reach this result.  R. at 1481.  The ALJ also found that "Red Hawk
10  is not actually compelled to speak when it does not wish to speak, because the advertising
11  is not attributed to Red Hawk; Red Hawk is not identified as the speaker; Red Hawk is not
12  compelled to 'utter' the message with which it does not agree."  R. at 1492.

13      Plaintiffs appealed the ALJ's decision before a USDA judicial officer on September
14  20, 2005.  The appeal petition challenged the ALJ's disposition of Plaintiffs' compelled
15  subsidy claim and argued for the first time that the Board's assessments were
16  unconstitutional on a theory of compelled speech. R. at 1495.  The appeal petition also
17  argued that, because the Second Amended Petition was "sufficiently broad to include [a
18  compelled speech] claim and evidence was adduced at hearing on that claim," the ALJ
19  committed reversible error by failing even to consider whether the application of the Act was
20  constitutional. *Id.*  At the very least, Plaintiffs argued, the ALJ's decision should be vacated
21  and the case remanded to allow further opportunity to develop the evidentiary basis for their
22  compelled speech challenge.  R. at 1502.

23      Considering the same record evidence presented by Plaintiffs to the ALJ, the judicial
24  officer upheld the ALJ's denial of the petition in a Decision and Order dated November 8,
25  2005.  With regard to Plaintiffs' compelled subsidy claim, the judicial officer first observed
26  that the disputed assessments were specifically authorized by 7 U.S.C. §§ 4906(f) and
27  4906(g). R. at 1534-35.  Noting that Congress had declared the assessments necessary to the
28  promotional activities authorized under the Act, the judicial officer found that the advertising

1  funded by the assessments was government speech.  *Id.* at 1535.  The judicial officer then

2  held on the basis of *Livestock Marketing* that § 4906 did not violate the First Amendment

3  because there is no constitutional right not to fund government speech.  R. at 1535-36.

4        The Decision and Order concluded with a rejection of Red Hawk's compelled speech

5  claim.  The judicial officer reasoned that no First Amendment violation occurred because

6  compelled speech challenges can only succeed "if a party establishes that advertisements are

7  attributable to" itself and Red Hawk had failed to show such attribution under the doctrine

8  articulated in *Livestock Marketing*. *Id.* at 1536.  For these reasons, the judicial officer denied

9  Plaintiffs' request for remand and dismissed their claim.  *Id.* at 1538.

10       Plaintiffs now contend that the judicial officer's dismissal and refusal to remand

11  constituted an abuse of discretion under 5 U.S.C. § 706, and that the judicial officer

12  committed reversible error in rejecting their compelled speech claim.  As remedies, Plaintiffs

13  seek (1) an order staying the Decision and Order pending a final judgment in this action, (2)

14  a declaration that the Watermelon Research and Promotion Act is unconstitutional as applied

15  to them, (3) an order remanding the proceeding to Defendant with instructions to withdraw

16  and rescind the Decision and Order, exempt Plaintiffs from the assessments, and cease

17  applying the Act in an unconstitutional manner, and (4) costs and attorney's fees pursuant

18  to 5 U.S.C. § 504 and 28 U.S.C. § 2412.  Both parties move for summary judgment under

19  Federal Rule of Civil Procedure 56.

20  **II.    Standard of Review**

21       When parties move for summary judgment in a dispute involving the application of

22  the Administrative Procedure Act ("APA"), the "task of the reviewing court is to apply the

23  appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the

24  record the agency presents to the reviewing court."  *Florida Power & Light Co. v. Lorion*,

25  470 U.S. 729, 743-44 (1985).  "If the record before the agency does not support the agency

26  action, if the agency has not considered all relevant factors, or if the reviewing court simply

27  cannot evaluate the challenged agency action on the basis of the record before it, the proper

28

1   course, except in rare circumstances, is to remand to the agency for additional investigation

2   or explanation." *Id.* at 744.

3   **III.   Analysis**

4        The parties do not dispute the underlying facts in the case.  They rely on the same

5   record and do not argue that it is incomplete or misleading.  To the extent that there is

6   disagreement, it stems from varying characterizations of available record evidence.  Because

7   such characterizations do not constitute a "genuine dispute of material fact," summary

8   judgment is proper.  *Kalka v. Megathlin*, 10 F. Supp. 2d 1117, 1120 (D. Ariz. 1998)

9   ("Although the parties characterize the facts differently, the Court agrees that there is no

10  issue of material fact, and therefore the claims may be decided as a matter of law.").

11       **A.     Count I:  Remand**

12       Plaintiffs first contend that the judicial officer's failure to remand constituted

13  reversible error under 5 U.S.C. § 706.  They assert that when a case such as *Livestock*

14  *Marketing* triggers a change in a relevant legal standard while a case is pending but after the

15  time for the presentation of evidence has passed, remand is necessary to provide an

16  opportunity to present evidence directed at the new standard.  The First Amended Complaint

17  does not identify the particular provision of § 706 on which this claim is based, but Plaintiffs'

18  Response to Defendant's Motion for Summary Judgment explains that the failure to remand

19  was "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law."

20  Doc. # 23 at 5.  It therefore appears that Plaintiffs seek review of the judicial officer's

21  decision under 5 U.S.C. § 706(2)(A).  Because Plaintiffs' claim implicates the Due Process

22  Clause of the Fifth Amendment, the judicial officer's decision will also be reviewed under

23  5 U.S.C. § 706(2)(B).

24       **1.     5 U.S.C. § 706(2)(A)**

25       Section 706(2)(A) of the APA provides that agency adjudications shall be held

26  unlawful and set aside if they are "found to be arbitrary, capricious, an abuse of discretion,

27  or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The scope of review

28  under the 'arbitrary and capricious' standard is narrow, and a court is not to substitute its

1   judgment for that of the agency." *Motor Vehicle Manuf. Ass'n v. State Farm Mut. Auto. Ins.*

2   *Co.*, 463 U.S. 29, 43 (1983).  An agency decision is not arbitrary and capricious if it

3   "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action

4   including a 'rational connection between the facts found and the choice made.'" *Id.*

5   Generally, a decision is only arbitrary and capricious if the agency "has relied on factors

6   which Congress has not intended it to consider, entirely failed to consider an important aspect

7   of the problem, offered an explanation for its decision that runs counter to the evidence

8   before the agency, or is so implausible that it could not be ascribed to a difference in view

9   or the produce of agency expertise." *Id.*

10        Under the lenient standard of § 706(2)(A), the Judicial Officer's denial of remand

11   cannot be reversed.  The decision was based on the reasoned conclusion that Plaintiffs'

12   substantive arguments lacked merit.  Plaintiffs argued on appeal that (1) the ALJ committed

13   reversible error in failing to consider their compelled speech challenge; (2) the assessments

14   authorized under the Act constitute compelled speech; and (3) "[a]t the very least, [the ALJ's

15   decision] must be vacated and the case remanded for further proceedings to determine

16   whether speech was attributed to watermelon producers . . . and if so whether such attribution

17   can and does support a claim that the [Act] is unconstitutional as applied." R. at 1502.  The

18   judicial officer addressed the first argument by considering the merits of the compelled

19   speech claim.  *See* 5 U.S.C. § 557(b) ("On appeal from or review of [an] initial decision, an

20   agency has all the powers which it would have in making the initial decision.").  He

21   addressed the second by finding that the Board's advertisements were not sufficiently

22   attributed to Plaintiffs under the reasoning articulated in *Livestock Marketing*. R. at 1536-37.

23   Finally, the judicial officer denied remand on the ground that the arguments raised in the

24   appeal petition were unpersuasive.  *Id.* at 1537-38.

25        In denying remand, the judicial officer did not consider whether Plaintiffs had been

26   deprived of an opportunity to present evidence in support of their compelled speech claim,

27   but, given the content of the appeal petition, he was under no obligation to do so.  A petition

28   for remand to receive additional evidence is treated as a petition to reopen a hearing, *see In*

1  *re De Graaf Dairies, Inc.*, 41 Agric. Dec. 388, 428, 1982 WL 36950, at 27 (U.S.D.A. Mar.

2  29, 1982), and may be granted upon satisfaction of 7 C.F.R. § 900.68(2).  Under that

3  regulation, it is the burden of the party seeking remand to "state briefly the nature and

4  purpose of the evidence to be adduced . . . show that such evidence is not merely cumulative,

5  and . . . set forth a good reason why such evidence was not adduced at the hearing." *Id.*  An

6  agency's refusal to reopen the record generally cannot be deemed arbitrary and capricious

7  "unless the new evidence offered, if true, would clearly mandate a change in result." *Greene*

8  *County Planning Bd. v. Fed. Power Comm'n*, 559 F.2d 1227, 1233 (2nd Cir. 1976); *see also*

9  *Reese Sales Co. v. Hardin*, 458 F.2d 183, 186 (9th Cir. 1972) ("It has been uniformly held

10  that rehearings before administrative bodies are addressed to their own discretion.  Only a

11  showing of the clearest abuse of discretion can sustain an exception to that rule.").

12      Plaintiffs essentially concede that they failed to comply with 7 C.F.R. § 900.68(2).

13  They admit that they did not provide the judicial officer with any explanation for why they

14  did not adduce evidence concerning the compelled speech claim in the original proceedings

15  before the ALJ.  *Compare* Doc. # 19 at ¶ 9 ("Plaintiffs did not plead nor brief an as-applied

16  challenge to the [Act] before the ALJ, nor did their petition for appeal proffer what sort of

17  evidence they hoped to uncover upon remand, or why this hypothetical evidence was not

18  presented at the initial hearing.") *with* Doc. # 24 at 2 ¶ 2 ("Plaintiffs do not dispute the

19  statement contained in Paragraph . . . 9 of Defendant's Statement of Facts In Support of

20  Motion for Summary Judgment.").  There was no representation that the evidence was

21  unavailable, or that the compelled speech claim was precluded by the legal doctrines

22  operative at the time of the initial proceedings, or that an intervening change in law had

23  deprived Plaintiffs of the opportunity to argue the claim.  Nor did Plaintiffs ever articulate

24  the precise nature of the new evidence they wished to adduce.  *See* R. at 1502.

25      In fact, rather than set forth a "good reason" why the evidence in support of the

26  compelled speech challenge had not been adduced in the original proceedings, Plaintiffs'

27  appeal petition suggested that further proceedings were unnecessary.  The document stated

28  that the "Second Amended Petition was sufficiently broad to include" a compelled speech

claim, R. at 1502, that evidence already "adduced at hearing on that claim" was sufficient to demonstrate that the application of the Act was unconstitutional, *id.*, and that the ALJ "committed reversible error in failing to consider" whether the NWPB advertisements constituted compelled speech, R. at 1495. These statements implied that evidence had already been collected in support of a compelled speech claim actually argued before the ALJ. Given that the judicial officer had full authority to adjudicate the claims raised before the ALJ, 5 U.S.C. § 557(b), he had no reason to believe that additional proceedings would be needed.

Finally, it is noteworthy that even now Plaintiffs are unable to identify any existent non-record evidence that could support their compelled speech claim. At oral argument before this court, Plaintiffs explained that, if remand were granted, they would possibly interview social scientists and conduct surveys in an effort to establish speech attribution. This is therefore not a case where the judicial officer's refusal to remand precluded the plaintiffs from presenting identified evidence. Remand would only allow Plaintiffs to search for new evidence for which they have not yet searched. Given that this litigation has already gone on for over five years, the judicial officer's refusal to permit additional proceedings of such questionable utility was reasonable. *Cf. Eagle v. Armco, Inc.*, 943 F.2d 509, 513 (4th Cir. 1991) (refusing to remand a claim for benefits for another round of administrative evaluation in part because the claim had been pending for ten years).

Requests for rehearing have been denied in similar circumstances. In *Boonville Farms Coop., Inc. v. Freeman*, 358 F.2d 681 (2nd Cir. 1966), for example, a plaintiff milk handler who challenged a USDA assessment pursuant to the Agricultural Marketing Act of 1937 only produced one witness during initial administrative proceedings. When that witness's testimony was later deemed insufficient to support the claim, the plaintiff sought a rehearing to submit additional evidence. However, the Second Circuit denied that request under 7 C.F.R. § 900.68 because the plaintiff had "every opportunity to submit" that evidence originally, and had simply failed to do so. *Id.* at 682.

1

**2.     5 U.S.C. § 706(2)(B)**

2      Under 5 U.S.C. § 706(2)(B), an agency action must be held unlawful and set aside if

3  it is "contrary to constitutional right, power, privilege, or immunity."  Plaintiffs' argument

4  that remand of their compelled speech claim is necessary because *Livestock Marketing*

5  effected an intervening change in the doctrine on compelled subsidies is unpersuasive to the

6  extent that it raises a constitutional issue to be reviewed under this statute.

7      Due process encompasses the right to present evidence under governing legal

8  standards.  *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental

9  requirement of due process is the opportunity to be heard 'at a meaningful time and in a

10  meaningful manner.'").  Where the application of an intervening change in law would

11  interfere with this right, remand is necessary to prevent "manifest injustice."  *See, e.g.*,

12  *Cissell Mfg. Co. v. United States*, 101 F.3d 1132, 1137 (6th Cir. 1996) (granting remand on

13  a claim directly invalidated by an intervening rule change); *Consol. Coal Co.*, 77 F.3d at 904-

14  05 (same); *PPG Indus., Inc. v. United States*, 52 F.3d 363, 366 (D.C. Cir. 1995) (same);

15  *Harlan Bell Coal Co. v. Lemar*, 904 F.2d 1042, 1047-48 (6th Cir. 1990) (same).  By contrast,

16  remand is not granted where a party had a motive and opportunity to present evidence in

17  support of a claim doctrinally unaffected by any intervening change in law and simply chose

18  not to assert the claim.  *Betty B Coal Co.*, 194 F.3d at 502 ("We very much doubt that due

19  process would be offended by failing to afford [a claimant] a second opportunity to garner

20  and present evidence on an issue it could have and should have anticipated originally."); *see*

21  *generally Chevron, Inc. v. Hand*, 763 F.2d 1184, 1186 (10th Cir. 1985) (finding that a party

22  waived its right to introduce evidence that it neglected to proffer originally).

23      *Tackett v. Benefits Review Board*, 806 F.2d 640 (6th Cir. 1986), and *Faries v. United*

24  *States*, 909 F.2d 170 (6th Cir. 1990), respectively illustrate when remand is and is not

25  warranted under this rule.  In *Tackett*, a coal miner's widow brought suit under the Black

26  Lung Benefits Act.  The ALJ initially awarded benefits because, at the time, the miner's lung

27  cancer legally constituted a chronic disease that was sufficient to invoke a presumption in

28  favor of the claimant.  However, while the case was pending on administrative appeal, the

- 11 -

1    benefits review board, in an unrelated case, overruled the law which had formed the basis for

2    the ALJ's initial decision.  Rather than categorically treat lung cancer as a chronic disease

3    sufficient to invoke a presumption that benefits should be awarded, the new law placed the

4    burden on the claimant to establish that his or her form of lung cancer was a chronic disease.

5    Applying this new rule, the review board reversed the ALJ's award.  *Tackett* in turn reversed

6    the review board, finding remand necessary because the widow never had an opportunity to

7    gather evidence in light of the new evidentiary standard.  *Id.* at 642.

8         In *Faries*, an ALJ initially denied benefits to a coal miner under the Black Lung

9    Benefits Act because the preponderance of evidence did not indicate that he had lung cancer.

10   The governing evidentiary standard was subsequently relaxed so that benefits could be

11   awarded based on a single positive x-ray, and the ALJ reversed its initial decision in light of

12   this change.  Several months later, however, the United States Supreme Court invalidated the

13   law authorizing benefits under the relaxed standard.  Instead of a single x-ray, claimants

14   would, as before, have to show a preponderance of the evidence in order to receive benefits.

15   The claimant then sought remand for a new decision in light of the standard articulated by

16   the Supreme Court.  However, remand was denied.  It was explained that further proceedings

17   were unwarranted because the new evidentiary standard was effectively the same as the

18   original standard under which the ALJ had denied benefits, and under which the claimant had

19   already failed to present sufficient evidence despite having had the opportunity to do so.  *Id.*

20   at 175-76.

21        Plaintiffs' claim is unpersuasive in light of this authority.  First, due process does not

22   require remand because Plaintiffs had an opportunity to raise a compelled speech claim from

23   the very beginning.  Compelled speech challenges have long been recognized under the First

24   Amendment, *see, e.g.*, *Wooley v. Maynard*, 430 U.S. 705 (1977); *West Virginia State Bd. of*

25   *Educ. v. Barnette*, 319 U.S. 624 (1943), and *Livestock Marketing* left untouched the doctrines

26   operative in this area of law.  Faced with the narrow issue of whether a government

27   advertisement attributed to "America's Beef Producers" constituted compelled speech, it was

28   found that, on the basis of the record evidence, no First Amendment violation had occurred.

1    *Livestock Mktg. Ass'n*, 544 U.S. at 566-67.   This conclusion followed logically from

2    precedent and announced no new doctrine.  *See id.* at 565 n.8 (discussing the plaintiffs'

3    compelled-speech argument as drawing upon *Wooley*, 430 U.S. 705, and *Barnette*, 319 U.S.

4    624); *id.* at 567 n.11 (discussing how, in light of *Hurley v. Irish-American Gay, Lesbian and*

5    *Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995), the plaintiff's claim might have

6    succeed if framed differently); *id.* at 568 (Thomas, J., concurring) (discussing a long line of

7    compelled-speech cases that would have justified a finding in favor of the plaintiffs, had they

8    provided additional evidentiary support).  Because claims are typically remanded only when

9    the intervening change constitutes a substantial departure from the prior law, *compare*

10   *Consol. Coal Co. v. McMahon*, 77 F.3d 898, 903 (6th Cir. 1996) (remanding the case after

11   the Supreme Court invalidated the doctrine on which the ALJ relied to reach his decision)

12   *with Faries v. United States*, 909 F.2d 170, 175 n.4 (6th Cir. 1990) (declining to remand

13   where the intervening change was not "substantial"), remand is not warranted.  *See also*

14   *Kaiser Steel Corp. v. United States*, 1992 U.S. App. LEXIS 2831, at *4 (10th Cir. 1992)

15   (concluding that due process did not mandate a new hearing when the new law was

16   "substantially the same" as the old law).  Where Plaintiffs simply chose not to assert a

17   compelled speech claim originally and *Livestock Marketing* did not change the requirements

18   for such a claim, it cannot be said that Plaintiffs were unjustly deprived of an opportunity to

19   make their case.

20        Even if *Livestock Marketing* had hypothetically changed the law on compelled speech,

21   remand is not necessary to avoid "manifest injustice" because Plaintiffs neglected an

22   opportunity to present additional evidence in support of their compelled speech claim after

23   *Livestock Marketing* was decided.  "On appeal from or review of [an] initial decision, [an]

24   agency has all the powers which it would have in making the initial decision except as it may

25   limit the issue on notice or by rule."  5 U.S.C. § 557(b).  These appellate powers include the

26

27

28

1   power to preside at the taking of evidence.[2]  *Seacoast Anti-Pollution League v. Costle*, 572

2   F.2d 872, 879 (1st Cir. 1978).  Thus, evidence in support of Plaintiffs' compelled speech

3   claim could have been adduced in light of *Livestock Marketing* while the case was on appeal

4   before the judicial officer.  Yet there is no indication in the record that Plaintiffs made any

5   effort to adduce evidence before the judicial officer, or that he in any way precluded them

6   from doing so.  Plaintiffs state that the judicial officer denied their appeal "without allowing

7   [them] an opportunity to develop an 'as applied' challenge."  Doc. # 12 at ¶ 42.  However,

8   the portion of the record cited in support of this statement simply shows that the judicial

9   officer denied remand, not that he denied an attempt by Plaintiffs to adduce evidence while

10  the case was pending on appeal.  *See id.*

11      Plaintiffs' contention is also unpersuasive because they had ample motive to assert a

12  compelled speech claim in the initial proceedings before the ALJ.  Even under *United Foods*,

13  it was less than certain that Plaintiffs' compelled subsidy challenge would succeed.  A series

14  of cases had previously implied that compelled funding of government speech does not raise

15  First Amendment concerns.  *See, e.g.*, *Bd. of Regents v. Southworth*, 529 U.S. 217, 229

16  (2000); *Rosenberger v. Rector*, 515 U.S. 819, 833 (1995); *United States v. Lee*, 455 U.S. 252,

17  260 (1982); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 259 n.13 (1977).  In *United Foods*

18  itself, the Department of Agriculture raised the possibility that compelled subsidies similar

19  to those imposed by the Watermelon Promotion Board were constitutional under this

20  precedent.  533 U.S. at 416.  The issue was simply not decided because it had not been

21  properly raised on appeal.  *Id.* at 417.  Given the USDA's extensive supervisory authority

22

23  _____

24      [2] 5 U.S.C. § 556(e) provides in relevant part that the "transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the

25  exclusive record for decision in accordance with section 557 of this title and, on payment of lawfully prescribed costs, shall be made available to the parties."  Plaintiffs contend that this

26  section precluded the judicial officer from considering additional evidence on appeal. However, that interpretation has been rejected.  *See Costle*, 572 F.2d at 879 ("The first point

27  to make about this section is that it does not limit the time frame during which any papers

28  must be received.").

1  over the Watermelon Promotion Board, the body of precedent suggesting the possibility of

2  a government-speech defense to compelled subsidy claims, and the explicit references to that

3  defense in *United Foods*, Plaintiffs had ample reason to anticipate a tenable government-

4  speech defense to their compelled subsidy challenge, and ample reason to add a claim not

5  subject to that defense.

6       Ultimately, Plaintiffs' request is more like the request that was denied in *Faries* than

7  the request that was granted in *Tackett*.  Plaintiffs had the option of raising a compelled

8  speech challenge from the very beginning.  They knew the existing doctrine on compelled

9  speech, they knew what evidence was necessary to make the claim, and *Livestock Marketing*

10 in no way altered the requirements for that claim.  They also had an opportunity to adduce

11 new evidence before the judicial officer after *Livestock Marketing* was decided.  Moreover,

12 given the probability of a tenable government-speech defense to their compelled subsidy

13 challenge, they had reason to assert a compelled speech claim in the initial proceedings.

14 Plaintiffs simply chose not to challenge the Board's assessments on this theory.  They took

15 a strategic gamble and lost.  In these circumstances, remand is not necessary to avoid a

16 "manifest injustice."  *Faries*, 909 F.2d at 176.

17      Cases cited by Plaintiffs are distinguishable.  In *Pelts & Skins, LLC v. Landreneau*,

18 448 F.3d 743 (5th Cir. 2006), the plaintiff contested the constitutionality of a compelled

19 subsidy of the Louisiana alligator marketing program.  The subsidy was originally held to

20 be unconstitutional under the law as it existed before *Livestock Marketing*.  However, once

21 *Livestock Marketing* was decided, the Fifth Circuit remanded so that the plaintiff could

22 present additional evidence in light of the new doctrine on compelled subsidies.  *Id.* at 743-

23 44.  While *Landreneau* addressed the propriety of remand in light of *Livestock Marketing*,

24 the similarities end there.  Remand was granted on a compelled subsidy claim, not a different

25 claim such as compelled speech.  The procedure was warranted with regard to the former

26 because the standard established in *Livestock Marketing* changed the requirements for the

27 plaintiff's compelled subsidy claim and affected the relevance of its evidence after it had

28 made its case.  *Id.* at 743.  In those circumstances, without remand, the plaintiff would have

1   had no opportunity to argue its claim in light of the governing law.  Here, by contrast,

2   Plaintiffs' had an opportunity to assert a compelled speech claim before the ALJ and simply

3   chose not to take advantage of it.

4         Plaintiffs also cite to *Peabody Coal Co. v. Greer*, 62 F.3d 801 (6th Cir. 1995).  In that

5   case, a miner sought relief under the Black Lung Benefits Act, and the defendant mining

6   company attempted to rebut the claim with defenses based on 20 C.F.R. §§ 727.203(b)(1)-

7   (4).  The ALJ found the employer's arguments unpersuasive with respect to (b)(1), (b)(3),

8   and (b)(4).  However, because it appeared that the miner was still capable of performing

9   work, the ALJ found in favor of the employer under (b)(2) and denied relief.  The Sixth

10  Circuit subsequently made it substantially more difficult for employers to rebut claims under

11  (b)(2).  On appeal, the review board applied the new (b)(2) standard to reverse the ALJ

12  decision.  Because the employer had not challenged the ALJ's initial findings on (b)(1),

13  (b)(3), or (b)(4), the board also upheld the ALJ's decision in favor of the miner on those

14  defenses and awarded benefits.  Noting that "manifest injustice" would otherwise occur,

15  *Peabody* then remanded so that the employer could gather additional evidence in support of

16  its defense under 20 C.F.R. § 727.203(b)(3).  In reaching this outcome, it was noted that the

17  employer had only failed to challenge the ALJ's initial finding on (b)(3) because the ALJ's

18  denial of benefits under (b)(2) had lulled the employer into a false sense of security.  *Id.* at

19  804.  It was also noted that although the law governing (b)(3) never changed, the substantial

20  alteration of the (b)(2) standard warranted remand because it "dramatically affect[ed]" the

21  employer's litigation strategy.  *Id.*

22        *Peabody* thus granted remand even though the law affecting the claim on which

23  remand was sought never changed.  However, two important justifying circumstances for that

24  result do not apply here:  First, the mining company only failed to present evidence in

25  support of its (b)(3) defense because of a decision already rendered in its favor under (b)(2).

26  By contrast, Plaintiffs failed to present evidence on their compelled speech claim because of

27  their own independent judgment that it was extraneous to the compelled subsidy challenge

28  on which they were originally content to rest their case.  While it may be "manifest injustice"

1   to deny remand when a party has been lulled into a false sense of security by a favorable

2   adjudication in its own case, it is no injustice to do so when a party failed to assert available

3   claims based on a presumption concerning the outcome of litigation not yet begun, and on

4   which it has not prevailed in any stage of the proceedings.

5       *Peabody* is also distinguished because the alteration of the (b)(2) standard in that case

6   "dramatically affect[ed]" the employer's litigation strategy.  *Id.* at 804.  Prior to the

7   intervening change in law on (b)(2), the employer had no reason to challenge the ALJ's

8   adverse decisions on its other defenses; it had already won under (b)(2).  However, when the

9   employer's (b)(2) defense became unpersuasive in light of the intervening change, the

10  employer developed a new motive to challenge the ALJ's disposition of its other defenses.

11  Here, by contrast, Plaintiffs had a reason to assert a compelled speech claim from the very

12  beginning.  The substantial body of cases suggesting the existence of a government-speech

13  defense gave Plaintiffs reason to believe that their compelled subsidy claim may fail, and

14  therefore reason to assert alternative theories of relief.

15      For these reasons, Defendant's motion for summary judgment on Count I will be

16  granted.  Plaintiffs' cross-motion for summary judgment on Count I will be denied.

17      **B.    Count II: Compelled Speech**

18      "It has long been established that the First Amendment prohibits the government from

19  compelling citizens to express beliefs that they do not hold.  *R.J. Reynolds Tobacco Co. v.*

20  *Shewry*, 384 F.3d 1126, 1134 (9th Cir. 2004).  "The right of freedom of thought . . . includes

21  both the right to speak freely and the right to refrain from speaking at all."  *Wooley v.*

22  *Maynard*, 430 U.S. 705, 714 (1977).  The government may violate this right either by

23  compelling an individual actually to speak in a manner that contravenes his or her personal

24  views, *see West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), or by

25  attributing its own speech to an individual who disagrees with the government message, *see*

26  *Wooley*, 430 U.S. 705.  While the precise level of attribution necessary to sustain a claim of

27  compelled speech has never been articulated, it is clear that government speech generically

28  attributed to a large group, such as an entire agricultural industry, does not constitute

1   compelled speech with regard to individual members of the group. *Johanns v. Livestock*
2   *Mktg. Ass'n*, 544 U.S. 550, 566-67 (2005).

3       Plaintiffs do not contend that the government has actually compelled them to speak.
4   Rather, they argue that they disagree with the advertisements of the Promotion Board, and
5   that those advertisements are sufficiently attributed to them to constitute compelled speech
6   violative of the First Amendment. The argument is unpersuasive. *Livestock Marketing* is
7   precisely on point. In that case, two associations of beef producers objected to the content
8   of government advertisements funded by statutorily mandated assessments on members of
9   the cattle industry. The plaintiffs argued that the advertisements unconstitutionally attributed
10  government speech to them by using a funding tagline which read, "America's Beef
11  Producers." However, the claim was rejected because the words "America's Beef
12  Producers" referred to the beef industry as a whole and did not explicitly associate the
13  individual plaintiffs with the government's message. *Id.* at 565-67. *See also Avocados Plus*
14  *Inc. v. Johanns*, 421 F. Supp. 2d 45, 57 (D.D.C. 2006) ("Given that Avocado Act promotions
15  make no reference to individual avocado growers or importers, the Court has grave doubts
16  that Plaintiffs can succeed on their as-applied claim. Livestock Marketing makes clear that
17  a generic tagline . . . without more, is insufficient to raise the possibility of attribution.").

18      Like the advertisement at issue in *Livestock Marketing*, the Board's promotional
19  materials refer only generically to the members of a large agricultural industry. The
20  Board's Resource Guide mentions the organization's "more than 3,100 producer, handler
21  and importer members," but says nothing directly about Plaintiffs as individuals. Doc. #
22  14, Exhibits 2 & 3. The same is true for the Board's Media Kit, which merely refers to
23  "[w]atermelon growers and shippers." Doc. # 14, Exhibit 4. Such language does not
24  attribute the advertisements to Plaintiffs as individuals.

25      Plaintiffs brave that a finding of attribution is warranted because the promotions
26  are attributed exclusively to members of the watermelon industry and do not
27  communicate that they are funded through a government program. They also argue that
28  attribution is warranted because a consumer would naturally conclude that Plaintiffs, as

- 18 -

watermelon growers, support the message communicated by the Board.  However, the same could have been said about the beef advertisements in *Livestock Marketing*.  The funding tagline that attributed those promotions to "America's Beef Producers" did not mention any government program, and a beef consumer would have naturally concluded that the beef industry plaintiffs supported the Cattlemen Board's pro-beef message.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Doc. # 18) is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Cross-Motion for Summary Judgment (Doc. # 23) is DENIED.

IT IS FURTHER ORDERED that the clerk enter judgment in favor of Defendant and that Plaintiffs take nothing.  The clerk shall terminate this case.

DATED this 21st day of November 2006.

Neil V. Wake
United States District Judge